UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PATRICIA COBBINS, | ) |
|          Plaintiff, | ) No. 17 CV 2389 |
| v. | ) Magistrate Judge Young B. Kim |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | ) |
|          Defendant. | ) March 19, 2018 |

**MEMORANDUM OPINION and ORDER**

Patricia Cobbins filed an application for Disability Insurance Benefits ("DIB") alleging that she is disabled by cerebrovascular disease, hypertension, glaucoma, and headaches. After the Commissioner of the Social Security Administration denied her application, Cobbins filed this suit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross-motions for summary judgment. For the following reasons, Cobbins's motion is denied and the government's is granted:

**Background**

Cobbins filed her application for DIB in April 2013, claiming a disability onset date of October 1, 2011. (A.R. 127-29.) After her claims were denied initially and upon reconsideration, (id. at 92-95), Cobbins sought and received a hearing before an Administrative Law Judge ("ALJ") where she appeared pro se, (see id. at 31-32). The hearing took place on September 2, 2015, and the ALJ issued a decision concluding that Cobbins is not disabled on October 23, 2015. (Id. at 8-61.) When

the Appeals Council denied Cobbins's request for review, (id. at 1-5), the ALJ's decision became the final decision of the Commissioner, *see Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). Cobbins filed this lawsuit seeking judicial review, *see* (R. 1); 42 U.S.C. § 405(g), and the parties consented to this court's jurisdiction, *see* (R. 14); 28 U.S.C. § 636(c).

**Facts**

Cobbins worked full time as an administrative assistant at a law firm for nearly 30 years leading up to October 2011 when she was laid off. (A.R. 150-51.) After losing her job, Cobbins collected unemployment benefits until March 2013. (Id. at 47.) Cobbins asserts that beginning in October 2011 her health problems prevented her from engaging in full-time work. During her 2015 hearing, Cobbins presented medical and testimonial evidence in support of her claim.

**A.     Medical Evidence**

The medical record demonstrates that in October 2011 Cobbins had a regular checkup with her primary care provider at University of Illinois Hospital and Health Sciences System ("UI Health"). (A.R. 225.) During that visit, Cobbins complained of painless swelling in her left ankle but ambulated normally with no edema in her lower extremities. (Id. at 224-25.) Her physician referred her to a neurosurgery clinic to begin routine follow-up on two cerebral aneurysms which were identified back in 2003, one of which was treated that same year with coiling and shunt placement. (See id. at 225.) Her primary care physician noted that the other aneurysm was deemed "benign and required no intervention." (Id.)

Cobbins returned to UI Health a week later for a follow-up visit and reported no headaches or neurologic symptoms. (Id. at 219.) She was "asymptomatic" with no visual problems, weakness, or gait disturbance, and with intact strength and sensation. (Id. at 220.) Her physician emphasized that she needed to see a neurosurgeon for regular follow-up on her aneurysms and gave her another referral because she did not pursue the previous referral. (Id. at 221, 225.)

The next medical record is from May 2013 when Cobbins went to UI Health for a routine visit. (Id. at 216.) Appointment notes reflect that she had not followed up regularly with a neurosurgeon as previously suggested. (Id.) A physical exam was unremarkable and Cobbins exhibited 5/5 musculoskeletal strength and good range of motion. (Id. at 217.) The following day, her primary care physician noted that Cobbins called the clinic "very upset" about disability forms he had completed because he indicated on the form that she could lift up to 50 pounds and walk more than one block. (Id. at 215.) He noted that he only saw her once a year, that there were no issues that would limit her ambulation, no documented weakness post-aneurysm, and no obvious limitations on how much she can lift. (Id.) Nonetheless, he offered to refer Cobbins to an occupational therapist for another evaluation to "further characterize any possible limitations." (Id.)

A week later in May 2013, Cobbins visited the UI Health neurosurgery clinic and reported occasional headaches and tiredness. (Id. at 228.) A physical exam was unremarkable and she had a normal gait. (Id. at 229.) An echocardiogram performed shortly thereafter showed normal left ventricular function. (Id. at 237.)

3

Then two days after the echocardiogram, an occupational therapist, Supriya Sen, evaluated Cobbins and provided a physical residual functional capacity ("RFC") assessment. (Id. at 231-36.) Sen opined that Cobbins was only capable of work on a sedentary level, but noted that Cobbins's participation in the evaluation was "self-limited on the lifting and carrying tasks" because of a "sharp pain in her stomach." (Id. at 234.) During the evaluation, Cobbins reported having pain at an 8/10 level in her right hand. (Id. at 233.) Sen observed some inconsistencies in Cobbins's grip strength test, noting that for her right hand the dynamometer presented "a straight line instead of the expected bell curve." (Id. at 231.) Sen explained that as long as Cobbins's "extrinsic digital flexor muscles of her hand are functioning, sincere effort would have produced a bell curve." (Id.)

At the end of May 2013, Cobbins underwent a cerebral angiogram, which showed that the previously treated aneurysm remained closed and the untreated aneurysm remained unchanged. (Id. at 258, 262.) Documentation from the test noted that she "remain[ed] clinically very well" and that although she reported intermittent headaches, she denied double vision, weakness, or balance problems. (Id. at 282.) She complained of blurred vision before the angiogram was performed, but said it was resolved with prescriptive glasses. (Id.) Cobbins also denied any dizziness, musculoskeletal issues, and psychological issues. (Id. at 283.) Physical and neurological exams were unremarkable. (Id.)

In June 2013 Dr. Kenneth Levitan performed a consultative psychiatric evaluation of Cobbins. Based on an in-person interview and his review of her

4

disability report and neurosurgery records from May 2013, Dr. Levitan diagnosed Cobbins with mild chronic organic brain syndrome with depressed mood secondary to past subarachnoid hemorrhage. (Id. at 256.) He observed that she had a slow-moving, unsteady gait. (Id. at 254.) She reported having difficulty being around a lot of people for the past four to five years, difficulty concentrating, and worsened short-term memory. (Id.) She also said she had difficulty keeping work deadlines and doing mathematical calculations. (Id. at 255.) She reported that she "gets along with other people" but "denied having any friends." (Id.) Cobbins exhibited increased sadness and labile crying as the interview progressed and Dr. Levitan noted that she had difficulty concentrating. (Id. at 256.) He reported that her recent memory "seemed fairly good" although she was slow in responding to questions and remembering things. (Id.) Dr. Levitan also observed that her judgment seemed questionable at times. (Id.) He opined that she would have difficulty handling moderate work pressure and stress, but that she could perform simple and routine tasks, communicate with coworkers and a supervisor, follow and understand instructions as long as she is not expected to retain them by the next working day, and manage her own funds. (Id. at 256-57.)

In July 2013 another consulting physician, Dr. Phillip Galle, opined that Cobbins suffers from the late effects of cerebrovascular disease and organic brain syndrome. (Id. at 66.) He opined that she is capable of light work without concentrated exposure to hazards. (Id. at 68-69.) Dr. Mary Sandra Story also performed a psychiatric review in July 2013 and concluded that Cobbins's mental

5

impairment is "considered non-severe" and that she only has mild limitations in activities of daily living, social functioning, and concentration, persistence, or pace, with no episodes of decompensation of extended duration. (Id. at 66.) Dr. Story noted no history of mental impairments, memory problems, or processing difficulties. (Id. at 67.)

Later that same month, Cobbins returned to UI Health to see a neurosurgeon. Records from this visit indicate that she had "recovered well" from her cerebral aneurysm and "has only had sporadic followup [sic]." (Id. at 262.) Her physician noted that the untreated aneurysm had not significantly changed when compared to a previous angiogram performed in February 2004, but that recent developments in the treatment of cerebral aneurysms allowed for more treatment options, which he explained to Cobbins. (See id. at 263.) Cobbins indicated she would discuss these options with her family before making a decision. (See id.)

Five months later in December 2013, Cobbins returned to UI Health complaining of occasional lightheadedness and headaches, which she said improved when she took her blood pressure medication. (Id. at 337.) Then in January 2014, Cobbins saw Dr. Harit Bhatt, an ophthalmologist, complaining of blurred vision and pain in her right eye. (Id. at 315.) Dr. Bhatt prescribed eye drops and noted possible glaucoma and the potential need for cataract surgery in the future. (Id.)

A week later in January 2014, Dr. Fauzia Rana conducted a consultative examination of Cobbins, who reported having headaches three to four times a week, right-sided weakness, difficulty lifting heavy things with her right hand, and some

6

numbness in her right fingertips and right toes. (Id. at 299.) Cobbins also reported being able to walk only half or one block and tiring easily. (Id.) A physical exam showed no difficulty in various movements and slightly decreased grip strength in her right hand, but full grip strength in her left hand. (Id. at 300-01.) Cobbins experienced no difficulty performing manipulations with either hand, exhibited full range of motion in her hips, knees, and ankles, and had a negative straight leg raise test. (Id. at 301.) Muscle strength was 5/5 in her left arm and 4/5 in her left leg, and 4/5 in both her right arm and right leg. (Id.) Dr. Rana observed that Cobbins had a normal gait without limping or staggering and was able to walk more than 50 feet without assistance. (Id.) She exhibited mild difficulty hopping on one leg, but no difficulty getting on and off the exam table, tandem walking, walking on toes or heels, or squatting and arising. (Id.) Dr. Rana opined that Cobbins's judgment and memory seemed intact and that she relates well, is cooperative, and can handle funds. (Id.)

In February 2014 consulting physician Dr. Charles Wabner affirmed Dr. Galle's July 2013 finding that Cobbins is capable of light work, but noted some additional visual limitations. (Id. at 79-80.) Dr. Glen Pittman also affirmed Dr. Story's previous psychiatric review finding of only mild limitations in activities of daily living, social functioning, and concentration, persistence, or pace, but added migraines as a non-severe impairment. (Id. at 77-78.)

In May 2014 Cobbins went back to UI Health complaining of dizziness and palpitations. (Id. at 309.) A physical exam was unremarkable. (Id. at 310.) A few

months later in August 2014, Cobbins complained of darker vision in her right eye and reported that prescription eye drops were making her eyes red and itchy. (Id. at 360-61.) She was diagnosed with diabetes later that month. (Id. at 330.) Then in November 2014 Dr. Bhatt noted that Cobbins denied seeing flashes and floating objects. (Id. at 363.) He documented that she did not follow up with a glaucoma specialist despite his recommendation to do so and that she was non-compliant with prescribed eye drops. (Id. at 364.) During subsequent visits in January and March 2015, Dr. Bhatt noted that Cobbins still had not followed up with a glaucoma specialist and continued to deny flashes, floating objects, double vision, and eye pain. (Id. at 367-68, 371-72.) However, in July 2015, Cobbins complained of pain in both eyes when moving them quickly and occasionally seeing floating objects in her left eye's field of vision. (Id. at 415.) Dr. Bhatt noted that she has glaucoma and cataracts in both eyes, among other conditions. (Id. at 416.)

B.     **Cobbins's Hearing Testimony**

At the hearing held in September 2015, Cobbins appeared without attorney representation. The ALJ advised Cobbins of her right to representation and informed her of the specifics of that right. (A.R. 31-32.) Cobbins waived her right to representation on the record and in writing. (Id. at 32, 126.) She then described her work history to the ALJ. She said that as an administrative assistant at a law firm she had clerical duties such as answering the phone, light typing, receiving and making payments, and writing receipts. (Id. at 42.) She also testified that she made trips to court three to four times a week to drop off papers or file documents.

8

(Id. at 42, 44.) She explained that at the law firm she was seated for about half of the day and standing and walking for the other half. (Id. at 44-45.) According to Cobbins, the files she carried weighed approximately 10 to 15 pounds and at times she used a cart for heavier items she had to transport. (Id. at 45-46.) She also carried office supplies weighing about 20 pounds. (Id. at 46.) Cobbins left the law firm in October 2011 when she was laid off, and she collected unemployment benefits from October 2011 to March 2013. (See id. at 46-47.)

In describing her medical problems, Cobbins testified that she became unable to work when her vision worsened, her blood pressure increased, and she started experiencing headaches in May 2013. (Id. at 47.) She said that increasing her medication dosage resolved her blood pressure issues, which also helped improve her headaches. (Id. at 48.) As for her vision, Cobbins explained that she first noticed her vision was declining when she took a vision test to renew her driver's license in September 2013. (Id. at 49.) Cobbins testified that she has glasses and prescription eye drops, which she did not use consistently at first because they made her eyes red and her vision blurry. (Id. at 50-51.) She said she now uses the eye drops, (id. at 51), but that she sometimes still has a black spot in the vision of her right eye, (id. at 54). She also told the ALJ about her aneurysms, which she believes are partly the source of her vision problems and headaches. (Id. at 52.) Cobbins explained that her doctors recommended a stent to lower the risk of rupturing her untreated aneurysm, but she chose not to pursue that option because

of the potential risks. (Id.) She testified that her memory "is not good at all," which she said could be the result of the aneurysms or just the aging process. (Id. at 53.)

As for her activities of daily living, Cobbins told the ALJ that she lives at home with her husband. (Id. at 39.) She testified that she has a driver's license, but does not drive anymore because of her deteriorating vision, (id. at 40), and that she took public transportation to get to the hearing, (id. at 54).

## C. Vocational Expert's Testimony

The ALJ then heard testimony from a vocational expert ("VE") about the jobs available to someone with Cobbins's limitations. Based on the Dictionary of Occupational Titles, the VE determined that Cobbins's past law firm job would be classified as clerical work, semi-skilled and light as performed. (A.R. 56.) The ALJ then asked the VE a series of hypothetical questions regarding an individual with the same age, education, and work experience as Cobbins. First, the ALJ asked about the jobs this individual could perform if she had the RFC to perform light work and could tolerate frequent exposure to unprotected heights and moving mechanical parts, but could not drive commercially. (Id. at 57.) The VE testified that this individual could perform Cobbins's past work. (Id.) Next, the ALJ asked about the same individual from the first hypothetical, but with the added limitations of no climbing ladders, ropes, or scaffolds, no more than frequent use of stairs or ramps, no exposure to moving mechanical parts or unprotected heights, and no driving. (Id.) The VE said that such a person could still perform Cobbins's past work. (Id.) For the third hypothetical, in addition to the same restrictions

from the second hypothetical, the ALJ added another restriction that there be no conveyor belt-type items moving from right to left in front of the individual. (Id.) The VE said that if the conveyor belt restriction included the movement of a typewriter, then such a restriction would rule out past work. (Id. at 58.) However, the VE said there would be other jobs available for such an individual in the national economy such as order caller, cafeteria attendant, or sales attendant. (Id.) Finally, the ALJ asked about an individual with the same restrictions as in the third hypothetical, but who would miss two or more days of work per month because of headaches and would have difficulty reading normal print. (Id. at 58-59.) The ALJ added that the individual would be able to "read large print at work required objects [*sic*]" and should avoid workplace hazards. (Id. at 59.) The VE testified that such restrictions would rule out full-time work. (Id.)

**D.     The ALJ's Decision**

The ALJ applied the required five-step sequence for evaluating disability claims in reviewing Cobbins's application for DIB. *See* 20 C.F.R. § 404.1520(a). After finding that Cobbins met the insured status requirements for DIB through December 31, 2016, at steps one and two of the sequential evaluation process the ALJ determined that Cobbins had not engaged in substantial gainful activity after her alleged disability onset date and that she had the following severe impairments: late effects of cerebrovascular disease, hypertension, glaucoma, and obesity. (A.R. 13-15.) After concluding at step three that none of Cobbins's impairments meet or medically equal the severity of any listed impairment, the ALJ determined

11

that Cobbins maintains an RFC to perform light work with no climbing of ladders, ropes, or scaffolds, no more than frequent use of stairs or ramps, no work with moving mechanical parts or unprotected heights, and no commercial driving. (Id. at 15.) Based on this the ALJ determined at step four that Cobbins is able to perform her past relevant work as a clerical worker and, therefore, not disabled. (Id. at 24.)

## Analysis

Cobbins argues that the ALJ erred in her step-two and step-three analyses, gave insufficient weight to a state psychiatric examiner's opinion, erred in evaluating her RFC, and should have given more credit to her allegations.[1] This court reviews the ALJ's decision only to ensure that it is supported by substantial evidence, meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012) (internal quotation and citation omitted). This court's role is neither to reweigh the evidence nor to substitute its judgment for the ALJ's. *See Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). That said, if the ALJ committed an error of law or "based the decision on serious factual mistakes or omissions," reversal may be required. *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014).

### A.    Step-Two Analysis

Cobbins contends that the ALJ failed to properly analyze her impairments in combination at step two. More specifically, Cobbins argues that the ALJ failed to adequately consider the effects of her chronic brain syndrome, visual impairments,

---

[1] Because Cobbins's briefs were filed pro se, the court construes them liberally. *See Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015).

and obesity. First, Cobbins takes issue with the ALJ's finding that her chronic brain syndrome, which Dr. Galle identified as "severe," does not cause more than minimal limitations in Cobbins's ability to perform basic mental work activities. (A.R. 14.) The ALJ reasoned that despite Dr. Galle's characterization of her condition as "severe," Cobbins has only mild limitations in activities of daily living, social functioning, and concentration, persistence, or pace. (Id. at 14, 22.) The record corroborates the ALJ's explanation that Cobbins maintains her own hygiene and personal care, manages her finances, takes public transportation independently, shops, goes to church, performs light household cleaning, relates well to others, and passed her driver's license examination during the alleged period of disability. (See id. at 14, 53-54, 164-67, 254, 255, 299.) The record reflects few mentions of any mental health issues, with most records noting normal mental functioning or that Cobbs denied depression. (See, e.g., id. at 67, 217, 220, 273, 283, 301, 351, 378, 381, 420.)

As for her vision issues, the ALJ identified glaucoma as a severe impairment and included visual accommodations in the RFC assessment by precluding work with moving mechanical parts, unprotected heights, and commercial driving. (Id. at 15, 22.) Cobbins does not explain how these accommodations fall short, and as discussed below, there is little indication in the record that her visual impairments warranted additional restrictions. Regarding Cobbins's obesity, the ALJ explained that her obesity did not affect her ability to ambulate effectively, and that there was insufficient evidence indicating that her respiratory and cardiovascular systems

13

were unduly impaired. (Id. at 22.) The ALJ noted that Cobbins's diabetes and hypertension are well controlled with medication. (Id. at 14, 17.) And to the extent her obesity impacts exertional or postural functions, the ALJ included limitations to address those areas in the RFC. (Id. at 22.)

Furthermore, a favorable determination that any impairment is severe at step two generally does not require remand for further analysis. *See Curvin v. Colvin*, 778 F.3d 645, 648-49 (7th Cir. 2015) (explaining that an error at step two may be harmless if the ALJ considers all of the claimant's severe and non-severe impairments when determining the RFC). Here, the ALJ found that Cobbins suffers from the severe impairments of cerebrovascular disease, hypertension, glaucoma, and obesity, and went on to explain the effects those impairments have on her functioning. (Id. at 15-24.) The court thus finds no basis for remand in the ALJ's step-two analysis.

## B. Step-Three Analysis

Cobbins references a number of listings in her brief and cites to the ALJ's step-three analysis. However, the court finds no error in this portion of the ALJ's decision. First, the ALJ identified potentially applicable listings, including 2.02 (loss of central visual acuity), 2.03 (contraction of the visual field in the better eye), 2.04 (loss of visual efficiency, or visual impairment, in the better eye), 4.00H (other cardiovascular impairments), and 11.04 (vascular insult to the brain). (A.R. 15); *see* 20 C.F.R. Part 404 Subpart P, Appx. 1. The ALJ went on to explain that no treating or examining physicians opined that Cobbins's impairments meet any of the listed

criteria, and that the medical evidence did not include findings that meet or equal any of the requirements in the listed impairments. (A.R. 15.) More specifically, she explained that Cobbins shows only minimal deficit in her best-corrected visual acuity, and that the records relating to her hypertension do not include reference to any effects on a specific body system. (See id.) Finally, the ALJ addressed the relevant requirements of Listing 11.04, which include sensory or motor aphasia resulting in ineffective speech or communication, or significant and persistent disorganization of motor function in two extremities. (Id.) The ALJ concluded that these criteria are not met and there is ample record support for this conclusion. (Id.) Accordingly, the court finds no error in the ALJ's step-three analysis.

## C.  Medical Opinion Evidence

Cobbins also argues that the ALJ failed to include some restrictions from Dr. Levitan's psychiatric opinion in the RFC determination. Dr. Levitan opined that Cobbins would have difficulty handling moderate work pressure and stress and recommended that she be limited to performing simple and routine tasks. (Id. at 256-57.) He also opined that she could follow and understand instructions, but should "not be relied on to retain them by the next working day." (Id. at 257.) However, the ALJ explained that she gave Dr. Levitan's opinion reduced weight because there is little evidence in the record demonstrating the existence of any mental health impairments or cognitive restrictions. (Id. at 23.) The ALJ went on to explain that the record lacks notations regarding memory impairments or depression. (Id.)  She gave more weight to two state agency mental health

consultants, Drs. Pittman and Story, who concluded that Cobbins had no more than mild limitations in any of the paragraph B criteria and no mental health restrictions affecting her RFC. (See id. at 22.) Because these are valid reasons for rejecting Dr. Levitan's opinion, the court finds no error in the ALJ's treatment of it.

Cobbins does not mention the May 2013 opinion from Occupational Therapist Supriya Sen, but the court will address it in the interest of completeness and in light of her pro se status. Contrary to the ALJ's determination that Cobbins is capable of a reduced range of light work, Sen opined that Cobbins is only capable of performing sedentary work. (See id. at 231.) However, the ALJ properly explained why she chose to afford Sen's opinion less weight. The ALJ noted that according to Sen's own observations, Cobbins's participation in the evaluation was "self-limited on the lifting and carrying tasks" and that there were some "inconsistencies" in test results indicating insincere effort. (See id. at 22-23, 231, 234.) Furthermore, the ALJ pointed out that only a week after Sen's evaluation, Cobbins exhibited normal strength and gait among other largely unremarkable examination findings during a neurosurgery appointment. (See id. at 23, 283.) The ALJ was therefore justified in assigning less weight to Sen's opinion.

**D.     RFC Assessment**

Cobbins also challenges the ALJ's decision not to include additional limitations in the RFC assessment. Regarding mental restrictions, there is little evidence to support any mental limitations and ample support for the ALJ's decision to exclude mental restrictions. As for Cobbins's vision problems, the ALJ

16

added avoidance of unprotected heights and moving mechanical parts as an accommodation, (A.R. 22), and Cobbins has not explained how the record supports additional limitations. As the ALJ pointed out, from 2011 to 2013 Cobbins rarely complained of vision problems, (see id. at 17-18, 220), and wearing glasses helped resolve her blurred vision, (id. at 282). Cobbins also denied double vision, flashes, and floating objects on several occasions. (See, e.g., id. at 19, 282, 371, 407, 415.) Although at a July 2015 ophthalmology appointment she complained of occasionally seeing left-eye floaters and experiencing pain when moving both eyes quickly, she still denied double vision and flashes, and there are few other instances in the record where she mentions seeing floaters or having eye pain. (See id. at 415.)

Furthermore, the opinions of Drs. Galle, Story, Wabner, and Pittman all support the ALJ's RFC determination, and those opinions have support in the record. (See id. at 67-69, 77-80.) As the ALJ noted in her decision, Cobbins's physical examinations were generally unremarkable, in that Cobbs demonstrated normal gait and strength, good range of motion, and no neurological deficits. (See, e.g., id. at 17-20, 22-23, 217, 220, 224, 229, 283, 301, 310.) Even notes from her own treating physician indicate she is capable of lifting up to 50 pounds and walking more than one city block with no other limitations. (See id. at 215.) Because the ALJ properly considered the medical record to conclude that Cobbins is capable of a reduced range of light work, and because Cobbins has not shown she is entitled to additional restrictions or that the ALJ's reliance on the medical opinions was faulty, the court finds no error in the ALJ's RFC assessment.

### E. Symptom Assessment

Finally, because Cobbins makes reference to the ALJ's symptom assessment in her briefs, the court interprets this reference as a challenge to the ALJ's decision to give less than full credit to her statements. (See R. 19, Pl.'s Mot. at 8.) However, the ALJ provided sufficient reasons for finding that Cobbins's symptom allegations are not entirely credible. For example, the ALJ noted that Cobbins stopped working for reasons unrelated to her alleged disability and received unemployment benefits for about a year and a half after her alleged onset date in October 2011. (A.R. 21.) These were relevant factors for the ALJ to consider, *see Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005); *Schickel v. Colvin*, No. 14 CV 5763, 2015 WL 8481964, at *15 (N.D. Ill. Dec. 10, 2015) (collecting cases), especially because Cobbins herself testified that she left the law firm because she was laid off and that she was "ready, willing and able to work" until May 2013. (See A.R. 46-47.) This is not a case where Cobbins argues that she was forced into seeking employment by desperate financial straits, or that she did so out of a misapprehension of her own condition. *See Schmidt*, 395 F.3d at 746. But more importantly, the ALJ explained that Cobbins's allegations exceeded the complaints she made to treating sources, and physical examinations demonstrated "only minimal strength reductions, normal gait, and results supportive of [a] capacity to perform light exertional work." (A.R. 22.) The record corroborates these findings. (See, e.g., id. at 68-69, 215, 217, 220, 224, 229, 237, 283, 300-01.)

Cobbins points out in her reply that two state agency consultants appeared to credit her statements about the limiting effects of her symptoms, but nonetheless found her capable of a reduced range of light work. (See R. 22, Pl.'s Reply at 3 (citing A.R. 67); see also id. at 79.) This gives the court pause considering that the ALJ gave these opinions "great weight" without addressing this potential internal inconsistency. (See id. at 22.) But the ALJ's omission does not render the credibility assessment "patently wrong," especially in light of the other valid reasons the ALJ provided. *See Schreiber v. Colvin*, 519 Fed. Appx. 951, 961 (7th Cir. 2013) (noting that ALJ's credibility assessment can be imperfect but still not patently wrong); *see also Shideler*, 688 F.3d at 312 (upholding ALJ's credibility analysis even though that decision "was not perfect"). Accordingly, Cobbins has not shown that the ALJ committed reversible error in analyzing her testimony.

## Conclusion

For the foregoing reasons, Cobbins's motion for summary judgment is denied, the government's is granted, and the final decision of the Commissioner is affirmed.

**ENTER:**

*[signature]*

**Young B. Kim**
**United States Magistrate Judge**